Megan Pierce, Oregon Bar No. 232825 (lead counsel)
Rachel Brady, Illinois Bar No. 6312402*
Renee Spence, Florida Bar No. 0107419*
311 N Aberdeen St., 3rd Floor
Chicago, IL 60607
megan@loevy.com
brady@loevy.com
spence@loevy.com

*pro hac vice applications forthcoming

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## EUGENE DIVISION

**FRANK GABLE**,

     Plaintiff,

vs.

**FREDERICK ACKOM, PAUL BAIN, KENNETH PECYNA, LOREN GLOVER, WILLIAM PIERCE, LYNN FREDRICKSON, JOHN SALLE, TERRY CRAWFORD, STEVEN SASSER, KENT MCLAIN, DEAN PERSKE, DARRELL BERNING, DENNIS FOX, MICHAEL MCCULLOUGH, GUY DORMAN, MARK RANGER, ROBERT SUNDSTROM, EMIL BRANDAW, THOMAS MASON, DENNIS O'DONNELL, DEAN LEE RENFROW, KARL NELSON, JOHN MCCAFFERTY, AND MICHAEL HURLEY**,

     Defendants.

Case No.

**COMPLAINT**

Jury Trial Requested

## COMPLAINT

Frank Gable ("Plaintiff"), through his attorneys Loevy & Loevy, complaining of Defendants Frederick Ackom, Paul Bain, Kenneth Pecyna, Loren Glover, William Pierce, Lynn Fredrickson, John Salle, Terry Crawford, Steven Sasser, Kent McLain, Dean Perske, Darrell Berning, Dennis Fox, Michael McCullough, Guy Dorman, Mark Ranger, Robert Sundstrom, Emil Brandaw, Thomas Mason, Dennis O'Donnell, Dean Lee Renfrow, Karl Nelson, John McCafferty, and Michael Hurley, states as follows:

### INTRODUCTION

1.      Plaintiff spent almost 30 years in prison for a crime he did not commit: the 1989 murder of high-ranking government official Michael Franke.

2.      Plaintiff is entirely innocent of this crime and has always maintained his innocence.

3.      No physical or forensic evidence ever connected Plaintiff to the crime, and he had no motive to commit it.

4.      Instead, Plaintiff's arrest, prosecution, and wrongful conviction were entirely the product of Defendants' misconduct.

5.      Defendants built a case against Plaintiff based on nothing but false, fabricated evidence that was the product of unlawful investigative techniques.

6.      In order to secure Plaintiff's wrongful prosecution and conviction, Defendants also suppressed exculpatory evidence that would have shown Plaintiff was innocent and that Plaintiff could have used to undermine the testimony of the State's witnesses.

Complaint for Damages 2

7.    Finally, in 2019, after he was wrongfully imprisoned for almost three decades, Plaintiff's wrongful conviction was vacated and he was released from prison.

8.    Nothing can bring back the time Plaintiff lost; Plaintiff now brings this action to redress the devastating injuries Defendants caused him.

## JURISDICTION AND VENUE

9.    This action is brought pursuant to 42 U.S.C. § 1983 and Oregon law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

10.    This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

11.    Venue is proper under 28 U.S.C. § 1391(b). The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

12.    Plaintiff Frank Gable, a/k/a Franke Different Cloud, spent over 29 years in prison, and another 4 years under supervised release, for a crime he did not commit.

13.    At all times relevant to the events described in this complaint, Defendant Thomas Mason and other unknown law enforcement officers were police officers in the Salem Police Department acting under color of law and within the scope of their employment for the City of Salem.

14.    At all times relevant to the events described in this complaint, Defendants Frederick Ackom, Paul Bain, Kenneth Pecyna, Loren Glover, William Pierce, Lynn Fredrickson, John Salle, Terry Crawford, Steven Sasser, Kent McLain, Dean Perske, Darrell Berning, Dennis

Fox, Michael McCullough, Guy Dorman, Mark Ranger, Robert Sundstrom, and other unknown law enforcement officers were police officers in the Oregon State Police acting under color of law and within the scope of their employment for the State of Oregon. These Defendants, together with Defendant Mason, are referred to collectively as "Officer Defendants" throughout this Complaint.

15.    At all times relevant to the events described in this complaint, Defendant Michael Hurley was a forensic scientist with the Oregon State Police Forensic Services Division/Crime Laboratory acting under color of law and within the scope of their employment for the State of Oregon.

16.    At all times relevant to the events described in this complaint, Defendants Dennis O'Donnell, Dean Lee Renfrow, Karl Nelson, John McCafferty, and Emil Brandaw, collectively referred to as the "Supervising Defendants," and other unknown law enforcement officers supervised the Officer Defendants and Defendant Hurley. These Supervising Defendants participated in the misconduct alleged in this complaint and also directed, facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised. The Supervising Defendants and the Officer Defendants are referred to collectively as the "Police Defendants" throughout this Complaint.

17.    At all times relevant to this lawsuit, each individual Defendant, known and unknown, acted under color of law and within the scope of their employment. Each of the individual Defendants is sued in their individual capacity unless otherwise noted.

## FACTS

### Michael Francke is Murdered

18.     In the late 1980s, Oregon Department of Corrections ("ODOC") Director Michael Francke was leading an investigation into corruption and mismanagement within the Department of Corrections.

19.     Over the course of his investigation, Francke became aware of allegations of corruption and misconduct by multiple state employees including Defendant Loren Glover.

20.     Francke also discovered significant evidence of financial and other mismanagement within ODOC.

21.     As a result, in the period leading up to his death, Francke had also recommended that several subordinates be fired or demoted.

22.     Francke was prepared to testify about his findings before lawmakers on January 18, 1989, but he never got the chance.

23.     Around 6:45 or 7:00 p.m. on January 17, 1989, Francke was stabbed to death in the parking lot outside his office.

24.     Francke's office was located within the Dome Building, which was on the Oregon State Hospital and ODOC campus.

25.     Francke's car door was found open, but nothing was taken from him except his computer. His wallet, watch, and other valuables were on him when his body was discovered.

26.     The only eyewitness, a custodian at the Oregon State Hospital named Wayne Hunsaker, was walking from the Dome Building when he heard someone make a noise that sounded like they were surprised or hurt, or like their breath was being knocked out of them.

27.     Hunsaker turned and saw two men about 40 feet away from him. These men were standing feet apart and facing each other. He then saw the two men separate: one of the men—later determined to be Francke—walked east quickly back to the Dome Building, where he died trying to get into the building to call for help.

28.     According to Hunsaker, the other man—Francke's killer—ran west out of the parking lot.

**A Task Force Is Created to Investigate Francke's Murder**

29.     Shortly after Francke's murder, a team was assembled to investigate his death. The team included Supervising Defendants and several Officer Defendants.

30.     During the investigation, Supervising Defendants were apprised and approved of Officer Defendants' and Defendant Hurley's conduct, and/or participated in the misconduct.

31.     In the alternative, Supervising Defendants were aware or had reason to know of Officer Defendants' and Defendant Hurley's misconduct and ignored it.

**The Investigation Reveals Early Suspects**

32.     Each Defendant participated in the Francke murder investigation.

33.     The investigators' inspection of the crime scene provided minimal leads. Investigators collected fingerprints and a footwear impression from the scene.

34.     The murder weapon was never found.

35.     Francke's murder was one of the highest profile murders in Oregon history. The Oregon State Police conducted a sprawling and expensive investigation, interviewing well over 2,000 people.

36.     The investigation revealed a number of likely suspects, including some individuals who had personal or professional motivations to harm Francke, such as John Crouse and Timothy Natividad.

### John Crouse

37.     John Crouse, provided multiple, reliable confessions to the Francke murder—confessions that contained accurate non-public information, including about the nature of Francke's wounds and details of the physical altercation that were consistent with the crime scene and Hunsaker's reports.

38.     Crouse had no alibi.

39.     Police Defendants, including Glover and Pecyna, were aware of Crouse's confession.

40.     An FBI agent polygraphed Crouse and told Police Defendants that the confession was truthful.

41.     Despite this compelling evidence of guilt, Police Defendants dismissed Crouse as suspect.

### Timothy "Rooster" Natividad

42.     Another suspect was an individual named Tim "Rooster" Natividad.

43.     Police Defendants knew that Natividad was deeply involved in a criminal enterprise bringing drugs and contraband into Department of Corrections facilities, and that he was observed meeting with state officials involved with the ODOC shortly before Francke's murder.

44.     Natividad was at the Department of Corrections Headquarters when the murder occurred.

Complaint for Damages 7

45.     When Natividad was seen immediately after the murder, he had blood on his clothes.

46.     In the weeks after the murder, Natividad behaved erratically. He acted paranoid and violent, and came into a large sum of money.

47.     Police Defendants also learned that Natividad was known to carry knives and had told multiple people he intended to kill Francke, and that credible witnesses stated that Natividad was involved in the Francke murder.

48.     Witnesses also told Police Defendants that a police sketch of the suspect looked like Natividad.

49.     Again, Police Defendants disregarded this lead.

**Defendants Turn to Plaintiff Despite No Evidence**

50.     Given the high-profile nature of the crime, Defendants faced immense public pressure to arrest someone.

51.     Defendants held meetings where they decided to wrongly shift the investigation from the likely perpetrators to Plaintiff, who they knew was innocent.

52.     No physical or forensic evidence tied Plaintiff to the crime, and none of the 2,000 tips Defendants had received implicated Plaintiff in the crime.

53.     Unlike Crouse, Plaintiff had never confessed to killing or wanting to kill Francke.

54.     This is because Plaintiff was innocent. At the time of the crime, he was home with his wife at a party.

55.     But Plaintiff was an easy target: He was a powerless person with little means to defend himself.

56.    Once Police Defendants set their sights on Plaintiff, they contacted him in August 1989 and told him they wanted to speak to him.

57.    Defendants knew there was no reason to suspect Plaintiff had any involvement in the case.

58.    Despite this, Defendants focused their efforts on building a false case against Plaintiff at any cost.

59.    For no apparent reason, Officer Defendants, including Defendant Fox, subjected Plaintiff to a polygraph exam on September 13, 1989.

60.    Throughout the polygraph exam, Plaintiff truthfully denied any involvement in the Francke murder.

61.    Officer Defendants, including Ackom, subjected Plaintiff to a second polygraph exam just two days later.

62.    Officer Defendants, including Bain, Berning, and Ackom, falsely accused Plaintiff of failing his polygraph exams. Officer Defendants used this false assertion, along with other coercive tactics over hours of questioning, to obtain involuntary statements from Plaintiff.

63.    Indeed, Police Defendants, including Pecyna, Salle, Berning, Fox, Bain, Ackom, Crawford, Glover, McCafferty, Renfrow, and O'Donnell, continued to subject Plaintiff to repeated and coercive interrogations between September 1989 and Plaintiff's arraignment on April 9, 1990.

64.    During these interrogations, Police Defendants used tactics they knew to be coercive and improper, including threats that Plaintiff would receive the death penalty if he did not answer Police Defendants' questions, in order to obtain statements they could use to frame Plaintiff.

Complaint for Damages 9

65.    For example, when Police Defendants interrogated Plaintiff in April 1990, Police Defendants, including O'Donnell, Renfrow, Akom, McCafferty, and Bain conducted the interview with an explicit and agreed-upon goal of breaking Plaintiff and obtaining a false inculpatory statement, irrespective of his innocence.

66.    During this interrogation, Plaintiff repeatedly asserted his innocence. In response, Defendants Renfrow and O'Donnell called on Defendant McCafferty to use more aggressive tactics to coerce Plaintiff to falsely implicate himself or otherwise make involuntary statements that they could take out of context and use against him.

67.    In accordance with Police Defendants' plan to overcome Plaintiff's will, Defendants McCafferty choked Plaintiff until he lost consciousness.

68.    Police Defendants did nothing to intervene to stop Defendant McCafferty's conduct.

69.    Nevertheless, Plaintiff always maintained his innocence.

70.    Unable to coerce a false confession from him, Police Defendants selectively recorded Plaintiff's statements and then used those selective recordings to falsely suggest that Plaintiff made inculpatory statements that he never made.

71.    Police Defendants then drafted reports of their interrogations of Plaintiff in which they included fabricated statements that Gable never made.

72.    Police Defendants also fabricated statements about Plaintiff's demeanor, body language, and behavior during the interrogations to falsely incriminate him.

73.    Prosecutors relied on Police Defendants' fabrications about Plaintiff's statements to charge and prosecute Plaintiff.

Complaint for Damages 10

74.    Police Defendants withheld evidence relating to their misconduct during Plaintiff's interrogations. Their suppression deprived Plaintiff of evidence he could have used to undermine or exclude false testimony at trial that he had made statements inculpating himself in the murder of Michael Francke.

**Defendants Fabricate Witness Statements to Falsely Implicate Plaintiff**

75.    Meanwhile, to further build a false case against Plaintiff, Police Defendants planned to and did use improperly coercive tactics, including repeated polygraph examinations, to obtain false statements from third parties that could be used against Plaintiff.

76.    Police Defendants began tracking down and questioning individuals associated with Plaintiff or Plaintiff's community.

77.    Initially none of these individuals implicated Plaintiff in the murder of Francke in any way, and many truthfully denied any knowledge of the Francke murder and knowledge of who could have killed him.

78.    Police Defendants were aware that each witness's initial denial was truthful.

79.    Over the next few months, Police Defendants, including Crawford, Pecyna, Sundstrom, Perske, Ackom, McLain, and Pierce, repeatedly questioned and polygraphed these individuals with the intention of fabricating false evidence against Plaintiff.

80.    Police Defendants worked together to repeatedly and relentlessly interrogate and polygraph these witnesses until the witnesses finally succumbed to the pressure and agreed to provide false statements inculpating Plaintiff, understanding that the Police Defendants would not leave them alone until the Police Defendants had the false evidence they wanted.

Complaint for Damages 11

81.     The individuals selected by Police Defendants were all motivated to tell the Police Defendants what they wanted to hear, and Police Defendants capitalized on those motivations to frame Plaintiff.

82.     For instance, many of the witnesses had pending criminal charges, and Defendants threatened to ensure that the witnesses were charged with the Francke murder.

83.     Others were told that they could get deals on their pending charges in exchange for false statements against Plaintiff.

84.     Using improper and coercive tactics, Police Defendants conspired together and eventually obtained statements from these witnesses that falsely inculpated Plaintiff in Francke's murder.

85.     All of these witnesses' stories were demonstrably false, and the Police Defendants knew they were false. The witnesses merely regurgitated publicly available information and/or information fed to them by police.

86.     Yet Police Defendants used these witnesses' stories to create probable cause to prosecute Plaintiff.

87.     As but one specific example, Police Defendants, including Fredrickson, Pierce, Salle, Ackom, McLain, Dorman, Ranger, Mason, Brandaw, Nelson, and McCafferty, coerced and manipulated Cappie Harden and Jodie Swearingen into providing false interlocking stories about witnessing Plaintiff commit the murder. Harden told this false story at trial, and Swearingen testified about it at the grand jury.

88.     The story they came up with in order to satisfy Police Defendants was demonstrably false and directly contradicted the evidence from the only direct eyewitness.

89.    Police Defendants were aware of the falsity of Harden's and Swearingen's statements but relied on them to fabricate probable cause and to cause Plaintiff's prosecution and conviction.

90.    The above-described coercion and misconduct is but one example of Police Defendants' misconduct when interviewing and interrogating witnesses.

91.    Police Defendants used the following improper techniques (among others) that they knew were likely to elicit false testimony:

    a.    Police Defendants threatened witnesses with adverse consequences and/or offered them favorable treatment, including immunity or leniency, if they agreed to go along with what the Police Defendants wanted them to say.

    b.    Police Defendants subjected witnesses to countless polygraph exams and interrogations, and repeatedly and falsely told witnesses that they were lying and failing their polygraph exams; Police Defendants confronted witnesses with their alleged failures before continuing to polygraph and/or interrogate them, signaling to witnesses that the interrogation would not end until the witnesses gave statements that agreed with Police Defendants' false theory that Plaintiff committed the murder.

    c.    Indeed, many witnesses stated they provided false statements against Plaintiff to protect themselves because they believed it was the only way to make the interrogations, polygraph exams, and harassment stop.

    d.    Police Defendants fed witnesses the information to incorporate into the false witness statements.

Complaint for Damages 13

e.    Police Defendants also ensured that polygraph exams were administered on examinees while they were vulnerable due to their physical or mental state—conditions Police Defendants knew would yield unreliable polygraph results.

92.    Supervising Defendants knew of, encouraged, and/or approved of the use of these coercive and improper interviewing tactics.

93.    In the alternative, Supervising Defendants were aware or had reason to know of Police Defendants' misconduct and ignored it.

94.    Police Defendants did not disclose the improper means discussed above by which they procured false inculpatory statements against Plaintiff.

95.    Police Defendants also withheld exculpatory statements provided by many of the witnesses, which could have been used by Plaintiff to rebut the false inculpatory statements introduced against him at trial.

**The Murder Weapon**

96.    Investigators never found the weapon that was used to kill Michael Francke. And Defendants had no physical evidence connecting Plaintiff to the crime whatsoever.

97.    In the absence of such inculpatory evidence and in order to ensure that they could secure Plaintiff's conviction for the murder, Defendants decided jointly to fabricate evidence that could link Plaintiff to a possible murder weapon.

98.    For instance, Police Defendants, including Defendants Ranger and Bain, fabricated false statements that Plaintiff had asked someone he knew to help dispose of the murder weapon.

99.    Also, Defendants, including Defendant Hurley, fabricated additional false evidence, including false test results, to suggest that Plaintiff had access to the likely murder weapon.

100.    This false evidence was introduced against Plaintiff.

**Police Defendants Rely on False Evidence to Arrest Plaintiff**

101.    On April 8, 1990, based on the many false, fabricated, and/or involuntary statements discussed above, Plaintiff was arrested for the murder of Michael Francke. The next day, he was charged with six counts of aggravated murder and one count of intentional murder.

102.    At the time of Plaintiff's arrest, Defendants knew there was no probable cause for his arrest or to support the charges.

103.    Plaintiff was then continuously incarcerated for the next 29 years, until he was finally released from prison in 2019.

104.    The grand jury indicted Plaintiff for Francke's murder based on the false evidence Defendants fabricated.

**The Trial**

105.    As discussed above, the only evidence implicating Plaintiff at his criminal trial was fabricated and/or procured using improper means.

106.    There was no legitimate physical evidence linking Plaintiff to Francke's murder.

107.    The evidence fabricated by Defendants was used against Plaintiff to secure his conviction.

108.    The State introduced statements Defendants had fabricated, misrepresented, and/or coerced from Plaintiff. For instance, even though the murder weapon was never found, the State twisted Plaintiff's innocent statements about having commonplace access to kitchen

knives to suggest, without evidence, that one of Plaintiff's kitchen knives was used to stab Francke.

109.    The basis for Plaintiff's arrest, indictment, and conviction was evidence that was fabricated by the Defendants, including, for example, as described above.

110.    No reasonable jury could have convicted Plaintiff in the absence of the evidence fabricated by Defendants, or if presented with the evidence suppressed by Defendants.

111.    On June 27, 1991, the jury, in reliance on false evidence, convicted Plaintiff of aggravated murder.

112.    The State sought the death penalty, but the jury rejected the request and voted to sentence Plaintiff to life in prison without parole.

**Recantations and Exoneration**

113.    Plaintiff never gave up trying to prove his innocence.

114.    Since the trial, all but one of the witnesses who testified that they saw Plaintiff commit the crime or heard him confess have recanted and averred that their stories were the product of Police Defendants' coercion.

115.    In 2007, having exhausted his state remedies, Plaintiff filed a federal petition for a writ of habeas corpus. In 2014, Plaintiff's attorneys filed an amended petition, attaching with it affidavits from more than 15 witnesses averring that Police Defendants had coerced and manipulated them into falsely pointing the finger at Plaintiff, or attempted to do so.

116.    The State of Oregon did not and has not disputed that investigators used improper tactics during these interrogations.

117.    In April 2019, the District Court for the District of Oregon granted Plaintiff's petition, vacated his conviction, and ordered a new trial. About two months later Plaintiff was released on bond from the custody of the Oregon Department of Corrections.

118.    On September 29, 2022, the Ninth Circuit affirmed the District Court's decision, calling the facts of the case "extraordinary." It continued: "The district court granted Gable's petition and vacated his conviction. We agree with the district court's evaluation of the record, which is dramatically different than the one presented to the jury. What we now know, and the jury did not, is that the testimony of the State's main witnesses was irreversibly tainted by coercive investigative techniques, and that another man gave compelling confessions on multiple occasions." *Gable v. Williams*, 49 F.4th 1315, 1319-19 (9th Cir. 2022).

119.    On May 3, 2023, the District Court dismissed the charges against Plaintiff with prejudice.

120.    On September 11, 2023, Plaintiff provided notice to Defendants of his state law claims as required by ORS 30.275.

**Plaintiff's Devastating Injuries**

121.    Even though he is no longer wrongfully behind bars, Plaintiff is still not free from this nightmare.

122.    Plaintiff spent nearly three decades enduring unfathomable pain and hardship.

123.    He was deprived of his liberty and autonomy for nearly thirty years, including the ability to interact freely with his loved ones; to be present for holidays, births, deaths, and other life events; to pursue his interests; to engage in meaningful labor and develop a career; and to live freely, as an autonomous being.

124.     Instead, Plaintiff was detained in harsh, dangerous, and isolating conditions. He was branded a murderer. He lived in fear every single day. He experienced the deepest pits of despair, believing he would die alone in prison.

125.     He watched people get killed before his very eyes. His parents died and he never got to say goodbye, and he lost his years to have children and raise a family.

126.     As a result of his wrongful conviction and incarceration, Plaintiff must now attempt to rebuild his life outside of prison, all without the benefit of the life experiences that ordinarily equip adults for such a task.

127.     In addition to causing the severe trauma of Plaintiff 's wrongful imprisonment and loss of liberty, Defendants' misconduct caused and continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

128.     Though Plaintiff is no longer in prison, Defendants' very public targeting of Plaintiff, along with their deliberate dissemination of fabricated and false information to the news media, resulted in Plaintiff being subjected to public humiliation and harassment.

**CLAIM I - Fourteenth Amendment - Due Process - All Defendants**

129.     Plaintiff incorporates by reference herein the allegations set forth in this Complaint.

130.     In the manner described more fully above, Defendants, acting individually, jointly, and in conspiracy with each other, deprived Plaintiff of his constitutional right to due process and his right to a fair trial.

131.    Defendants fabricated and solicited false evidence, including statements they knew to be false, that falsely implicated Plaintiff in the murder of Michael Francke. They caused this evidence to be used to prosecute and convict Plaintiff.

132.    Defendants deliberately withheld exculpatory and impeachment evidence from Plaintiff, his attorneys and prosecutors, thereby misleading and misdirecting Plaintiff's criminal prosecution.

133.    Defendants also continued their investigation, despite the fact that they knew of—or were deliberately indifferent to—Plaintiff's innocence, and the results of the investigation were used to cause Plaintiff's wrongful prosecution and conviction.

134.    Defendants also used investigative techniques that were so coercive and abusive that they knew, or were deliberately indifferent to, the fact that those techniques would yield false information that was used to prosecute and convict Plaintiff.

135.    Supervising Defendants were charged with overseeing the investigation of the Michael Francke murder and the other individual Defendants. They were fully aware of the misconduct, the suppression of exculpatory evidence, the use of coercive investigative techniques, and the fabrication of a false case against Plaintiff. These supervisors nevertheless encouraged or condoned the misconduct, at times engaging in the misconduct, or in the alternative, intentionally ignored the misconduct, despite the fact that they knew of—or reasonably should have known—that the misconduct would deprive Plaintiff of his constitutional rights.

136.    Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to due process and a fair trial. Absent this

misconduct, the prosecution of Plaintiff could not and would not have been pursued, and he would not have been convicted.

137.    As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

138.    This misconduct in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

139.    Defendants were acting under color of law and within the scope of their employment when they took these actions.

### CLAIM II - Fourth/Fourteenth Amendment – Detention/Prosecution without Probable Cause ("Malicious Prosecution") – All Defendants

140.    Plaintiff incorporates by reference herein the allegations set forth in this Complaint.

141.    In the manner described more fully above, Defendants, acting individually, jointly, and in conspiracy with each other, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

142.    In so doing, Defendants caused Plaintiff to be deprived of his liberty, detained and prosecuted without probable cause, and improperly subjected to judicial proceedings for which there was no probable cause.

143.    Plaintiff's criminal proceedings were terminated in his favor.

144.    As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

145.    This misconduct in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

146.    Defendants were acting under color of law and within the scope of their employment when they took these actions.

**CLAIM III - Conspiracy - All Defendants**

147.    Plaintiff incorporates by reference herein the allegations set forth in this Complaint.

148.    In the manner described more fully above, prior to Plaintiff's conviction, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to violate Plaintiff's constitutional rights and/or secure Plaintiff's conviction of a crime he did not commit, as described in this Complaint.

149.    Defendants agreed to investigate and to exert influence to cause the prosecution of Plaintiff for a crime he did not commit and took overt actions in conformity with that agreement.

150.    As further described above, Defendants agreed to direct the investigation of the Francke murder away from the likely perpetrators and to focus the investigation on Plaintiff, who they knew or should have known was innocent; to fabricate evidence against Plaintiff, including false witness statements and reports; and to suppress exculpatory evidence that would have undermined the case against Plaintiff and proved his innocence.

151.    In so doing, Defendants conspired to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiff of his rights.

152.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered an unjust conviction, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

153.    This misconduct in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

154.    Defendants were acting under color of law and within the scope of their employment when they took these actions.

### CLAIM IV - Failure to Intervene - All Defendants

155.    Plaintiff incorporates by reference herein the allegations set forth in this Complaint.

156.    In the manner described more fully above, during the constitutional violations described therein, Defendants each stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

157.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered an unjust conviction, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

158.    This misconduct in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

159.    Defendants were acting under color of law and within the scope of their employment when they took these actions.

### CLAIM V - Malicious Prosecution (Oregon Law) - All Defendants

160.    Plaintiff incorporates by reference herein the allegations set forth in this Complaint.

161.    In the manner described more fully above, Defendants, individually, jointly, and in conspiracy with one another, and others unknown, instituted or continued the prosecution of Plaintiff without probable cause. As a consequence of the criminal prosecution Plaintiff was unlawfully seized, deprived of liberty, and wrongfully convicted of a crime of which he is innocent.

162.    Defendants acted intentionally or, in the alternative, maliciously, in causing these judicial proceedings to be carried out against Plaintiff.

163.    Plaintiff's criminal prosecution was terminated in his favor.

164.    As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

165.    This misconduct in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

166.    Defendants were acting under color of law and within the scope of their employment when they took these actions.

### CLAIM VI - Negligence (Oregon Law) - All Defendants

167.    Plaintiff incorporates by reference herein the allegations set forth in this Complaint.

168.    In the manner described more fully above, Defendants owed a duty of care to Plaintiff during their investigation of the murder of Michael Francke.

169.    Defendants breached their duty of care by fabricating evidence, suppressing exculpatory evidence, coercing involuntary statements from Plaintiff, and otherwise causing his wrongful prosecution, conviction and incarceration for a crime he did not commit.

170.    As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

171.    This misconduct in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

172.    Defendants were acting under color of law and within the scope of their employment when they took these actions.

**CLAIM VII - Negligent Supervision - Supervising Defendants**

173.     Plaintiff incorporates by reference herein the allegations set forth in this Complaint.

174.    Supervising Defendants had a duty to properly train and supervise their respective agents and employees.

175.    Supervising Defendants breached their duty to train and supervise by creating policies, practices, and customs that enabled the misconduct alleged in this complaint.

176.    Supervising Defendants breached their duty to train and supervise by failing to create policies, practices, and customs to prohibit or prevent the misconduct alleged in this complaint.

177.    As a result of Supervising Defendants' negligence, the individual Defendants violated Plaintiff's constitutional rights by committing the misconduct alleged in this complaint.

178.    As a result of the negligent training and supervision by Supervising Defendants, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

179.    This misconduct in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

180.    Supervising Defendants were acting under color of law and within the scope of their employment when they took these actions.

**CLAIM VIII - False Imprisonment (Oregon Law) - All Defendants**

181.    Plaintiff incorporates by reference herein the allegations set forth in this Complaint.

182.    Plaintiff was incarcerated beginning on April 8, 1990.

183.    The incarceration was not lawful. The indictment against Plaintiff was made without probable cause because it was based on fabricated evidence as alleged above, and was made without regard to exculpatory evidence that had been deliberately suppressed as alleged above.

184.    Defendants violated Plaintiff's rights by incarcerating him without probable cause.

185.    As a result of Defendants' misconduct, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

186.    This misconduct in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

187.    Defendants were acting under color of law and within the scope of their employment when they took these actions.

**CLAIM IX - Intentional Infliction of Emotional Distress (Oregon Law) - All Defendants**

188.    Plaintiff incorporates by reference herein the allegations set forth in this Complaint.

189.    In the manner described more fully above, Defendants, individually, jointly, and in conspiracy with one another, and others unknown, engaged in extreme and outrageous conduct by fabricating evidence, suppressing exculpatory evidence, coercing involuntary statements from Plaintiff, and otherwise causing his wrongful prosecution, conviction and incarceration for a crime he did not commit.

190.    Defendants' actions were rooted in an abuse of power or authority.

191.    Defendants' conduct was undertaken with reckless disregard of the high probability that the conduct would cause severe emotional distress to Plaintiff.

192.    As a result of Defendants' misconduct, Plaintiff suffered severe emotional distress, which was a reasonably foreseeable consequence of Defendants' conduct.

193.    This misconduct in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

194.    Defendants were acting under color of law and within the scope of their employment when they took these actions.

**CLAIM X - State Law Conspiracy (Oregon Law) - All Defendants**

195.    Plaintiff incorporates by reference herein the allegations set forth in this Complaint.

196.    In the manner described more fully above, prior to Plaintiff's conviction, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to violate Plaintiff's rights, as described in this Complaint.

197.    Defendants agreed to investigate and to exert influence to cause the prosecution of Plaintiff for a crime he did not commit and took overt actions in conformity with that agreement.

198.    As further described above, Defendants agreed to direct the investigation of the Francke murder away from the likely perpetrators and to focus the investigation on Plaintiff, who they knew or should have known was innocent; to fabricate evidence against Plaintiff, including false witness statements and reports; and to suppress exculpatory evidence that would have undermined the case against Plaintiff and proved his innocence.

199.    In so doing, Defendants conspired to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiff of his rights.

200.    The violations of Oregon law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

201.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered an unjust conviction, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

202.    This misconduct in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

203.    Defendants were acting under color of law and within the scope of their employment when they took these actions.

### PRAYER FO RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against all Defendants, awarding compensatory damages, attorneys' fees and costs against each Defendant, and any other relief that this Court deems just and appropriate.

### JURY DEMAND

Plaintiff requests a trial by jury.


Dated: July 11, 2024

                                    Respectfully submitted,

                                    Franke Gable

                            BY:    s/ Megan Pierce
                                    *One of Plaintiff's Attorneys*

                                    Rachel Brady (IL 6312402)
                                    Renee Spence (FL 0107419)
                                    Megan Pierce (OR 232825)
                                    LOEVY + LOEVY
                                    311 North Aberdeen St., 3rd Floor
                                    Chicago, IL 60607
                                    T: (312) 243-5900
                                    F: (312) 243-5902
                                    megan@loevy.com